The court, as I understand, reasons for this hearing, I am here today because of one case, Dubin. In this court, as I understand, what has been briefed to us is, the question now becomes, what of Dubin? And first and foremost, Dubin was a plain error case, today we are here because of the issue before us on the insufficiency was preserved for review, therefore, the standard of review is abuse of discretion and not plain error, as it was in Dubin. Judge Goldberg No, why is that? You both, if I recall the record, you both submitted the pattern instructions for 1028. Justice Breyer Yeah, I apologize, I think this was a bench trial. Judge Goldberg It was a bench trial, but you gave the district court, Judge Ezra, the Fifth Circuit pattern instructions for the identity aggravated identity theft. Justice Breyer And I would have to bring that up in a subsequent brief, I was not aware of that, I missed that. Judge Goldberg Well, assume that you did, and therefore it was the pattern, would you agree with me that Dubin would suggest then, if there's error, it's a legal error, either as to, correct? Justice Breyer That's correct. If we submitted that. Judge Goldberg Because the pattern, let me finish, counsel, am I right that it used to be that the use of the stolen identity could be sufficient if it were shown beyond a reasonable doubt that it had a relation to the fraud? But now the Supreme Court, correct me if I'm wrong, has said it has to be central to or crux to the fraud, is that right? Justice Breyer Yes. And I made that. Judge Goldberg Okay, but therefore that would be legal error, and if you prevail, are you disagreeing that the government would be entitled to retry you to get a shot at your client under the correct legal instruction? Justice Breyer Yes, they could. Judge Goldberg Okay. Justice Breyer I agree with that. Judge Goldberg All right. Justice Breyer And I hope Judge Goldberg So it's not a sufficiency issue, it's a legal issue. Justice Breyer Yeah. Judge Goldberg And you didn't Justice Breyer Obviously, if I'm wrong, I'd like to, I'll check it for in terms of any supplemental brief, Your Honor, but as I understand it, that's correct. I said that because that was the notation by this court in this court. They didn't say it was preserved, but it did go through the standard of approval. At the moment I looked at it, it looked quite different from plaintiff. Judge Goldberg Yeah. Justice Breyer So that's why Judge Goldberg It was a bench trial, so there's no unanimity problem. Justice Breyer No, sir. Judge Goldberg The issue is, is it fair to say the issue is just whether we as an appellate court looking at the record would say that the verdict, Judge Ezra's verdict, necessarily found that the use of the IDs was central to a key mover in the fraud. Is that the issue before us? Judge Ezra That's the issue before the court, but that's the issue the government does have to get over. Judge Goldberg Yeah. Judge Ezra We're back now to where it, and obviously it was never the standard before. Judge Goldberg Correct. Judge Ezra We are now back with this standard given down to us by this court, that is the key mover, I believe the crux is the U.S. Supreme Court choice of word, that would then be if it were a jury trial in the charge that way rather than related. Judge Goldberg Now, do you remember the closing arguments here? Judge Ezra Oh, I do not, Your Honor. Judge Goldberg Because the judge has received closing arguments in writing. Judge Ezra Yes, he did. Judge Goldberg And you weren't counsel for Croft, but in his closing argument Croft said the whole thing is a deck of cards. It all turns on the identity theft. Judge Ezra I think that statement was made in the context of the identity theft. If it wasn't there, it could have gone the other way. One of the things we will argue today that may be contrary to that is we submit far beyond the identities of those three or four gentlemen. There are others issues here which take it beyond that. Judge Goldberg But if the defense counsel said this case is all about the identity theft, it's a deck of cards, how can we now instead say, oh, well, actually they were very ancillary, they really didn't relate to the underlying fraud in the canine school? Judge Ezra I would submit to the Court that is what plain error is about. Judge Goldberg Okay. Judge Ezra Now, I don't think we . . . hopefully we don't have to go all the way to 255 one day, but respectfully, I think that is now the issue before the Court, and the fact that he said that, he was dealing with the law as it was back then before related to went on to become the crux of the issue. And that would be my only comment about that, is that he made that because that was the law in front of him, perhaps. And I don't think we have to be fully committed to that because if, in the effect, regardless if he said that, that the evidence showed otherwise, as we would argue today straight up plain error . . . Judge Goldberg Did you argue the original direct appeal? Judge Ezra Yes, sir, I did. Judge Goldberg You remember the government brief, and you Judge Ezra No, no, we didn't. Judge Goldberg You didn't have the en banc . . . Judge Ezra That's how I argued it. Dubin had not come down yet. Judge Goldberg The en banc, not the Supreme Court Dubin, the en banc Dubin. Judge Ezra Oh, the en banc of this Court had come down. Judge Goldberg Yes. Judge Ezra I apologize. Judge Goldberg If you recall that the government said the facts would meet even Judge Costa and even Judge Elrod's dissents, and thereafter, Judge Costa is on the panel that affirms. Do you understand what I'm saying? Judge Ezra No, sir, I don't. Judge Goldberg So the government defended the aggravated identity theft convictions, saying in this case, factually, it would even qualify under the dissenting viewpoints in the Dubin en banc. Judge Ezra I would apologize to the Court. I read that opinion today, his Fifth Circuit opinion. I missed that. Judge Goldberg Okay. Judge Ezra I think he made a notation. I think the main notation there was that this was moot because Dubin was already on its way up, and Dubin was the law of this circuit. Judge Goldberg Yes. Judge Ezra That's my recollection. Judge Goldberg That's the law of the circuit. No, absolutely, the panel followed the majority opinion, but the government has stated from day one that these facts, the identity theft, is so central, it would meet any test. And you're saying, no, it doesn't. Judge Ezra No, and that's our work today. Judge Goldberg Okay. Go ahead. Judge Ezra I agree. That's my cutting edge right there. Judge Goldberg Yeah. Judge Ezra If I can't show this, it's not going to work. I have to show that this was indeed the crux. We don't think we've waived that yet, though. Judge Goldberg Go ahead. Yeah, you haven't waived it. That's right. Judge Ezra No. Thank you, Your Honor. I'm sorry, Your Honor? Judge Goldberg I apologize. Yes, yes. If I said it backwards, we, in fact, what we have to say, and by the way, I think when we look at the U.S. Supreme Court decision, it is a continuing specter. We can't automatically say it was absolutely, clearly the crux, or on the other side, that it was just related to. As I understand the court's job now is to try to work their way in between those two, and in each set of circumstances, since all those past cases, which are a lot apparently in the federal system, may have been judged on the essential to, or part of, as opposed to, in fact, the crux, in fact, the starter of the fraud. I wrote the word down. I apologize to the court. A key mover, I think, was one of the things that the dissent pointed out. In this case, with respect to it being the end all of the issue, none of these people that we believe, because the government never proved who actually did the training of the veterans and their animals, is that we know that no one ever took on their identity. I note that, because one of the things they talk about at the U.S. Supreme Court, those are the various things we typically look at in an additional identity, i.e., nobody was out there saying, I'm such and such of those four people. Croft didn't impersonate. He didn't take the identity. Nobody impersonated anybody. There's no evidence that they did. In fact, one of the things I'm trying to lead to is that the government's evidence, maybe because of their old impression of the law, stopped when, after they had put those four on, they only put on one more man that probably, I'm going to submit to the court, was more important, that probably played a bigger role when proving this case was fraud. That was the gentleman who he picked as president. His president did everything as directed by Mr. Croft. Mr. Croft would go to him. This is definitely part of the fraud, as noted by this court. He would go to him when he wanted money for himself, and he would tell this gentleman, who, by the way, if I remember correctly, I think he had an injury at one time in life, and he was not well. I think it was a bullet to the head or something like that. He was part of a . . . And so he had a hard time comprehending, so all he did, he was pretty much a . . . I don't want to use the word puppet, but he was the president who did whatever Ms. Croft told him to do. And per this court's opinion, a lot of that fraud started to show up then. All of these monies went into a mobile home, jet skis . . . What does this have to do with the question before us? I'm sorry, Your Honor? What does that have to do with the question before us? I think it has a lot, Your Honor. If we look at the whole fraud, it's stated this way. If the government had put the evidence of these four on and stopped there, I don't think they've showed fraud yet. I think part of that fraud was how this money was spent and who actually may have been out there. The government stopped at that point. They didn't show who actually went out there and did the fraud. You're agreeing that there was fraud? No. Yes. Oh, yeah. This is . . . All right. So what you have . . . And we can back up this wonderful fraud case if it's true. And I have to say that I'm going to have my client, he wants to do a 25-page fraud. But you can only prevail if you show that the use of the identity was not the crux of the criminal conduct. It does. Isn't that right? Correct. I have to show . . . All right. So let me finish. I'm sorry. And so if the use of the identity wasn't the crux, tell me what was. I'm telling you that all the circumstances, mainly what happened after he started running this place, is what shows fraud. How he worked with these people, what he did with the money, how he ran the thing, once he got approval. What he did with the money that he got by fraudulent means. And that's part of it. So now we're talking about subsequent to the fraud. And that's part of it. I would submit this also. When you . . . Because of this . . . And I think this is one of the most important points. One of these trainers, and I'm going to get his name right, Mr. Keeley, was a man who said, I did work out there some, but he said I didn't ultimately give him the permission to use my name in the end to do this for the veterans. The reason I'm offering that is because what happens is that when he gets approved . . . Let me back up. He had to try to get approved four times. And I need to address this at the same time. I'm aware one of those instructors had passed away that was on the final list. So that man couldn't have given services. The fraud as to him was all about who? Well, he could have. Because here's why. He was dead. No, no. Judge, in the first applications and the second applications, he was alive. He was, yes. He was alive. And what happened is, I would submit to you, that really wasn't . . . Because he kept . . . They had him coming back constantly. I think he started to . . . And I don't think this was fraud. If he was dead and he knew it was fraud, dead, it's fraud. Okay? But they never went so far as to prove that anybody knew he was dead at the time he started redoing these applications. The government interviews have no evidence of that. And it's not . . . It wasn't my . . . Are you conceding that if he was dead the whole time . . . No, sir. . . . that it would, therefore, be the crux? No, no. On the first one . . . I have to confess, I'm not really understanding why you're arguing it this way. Why not just focus on what the fraud was here and whether the identity theft was the crux of that crime or not? That seems to be the question presented under . . . And what I'm trying to get to, Your Honor, is that I agree. I'm getting around the motion. Okay. You've got three minutes. Thank you, Your Honor. Mr. . . . When you go back to that man that worked there for some time, he said when it ultimately asked for permission that he didn't do it. These things . . . And I'm glad the veterans experts said this. These are like doing beauty salons. There is no school for it. There is no college for it. There is no preordained thing for it. It has to be on a case-by-case basis. And I think it goes more beyond just the fact that he used some names, that they ended up all being mad at him for using them, but some of them did work out during that time period. And what I'm trying to say is once you get to the end of it all, there are other things that make this fraud other than just . . . But . . . . . . lying. But is it true that the surviving three instructors whom he told the Texas Commission would be his trainers . . . Two of them never worked out there at all, is my recollection. All of them said they never consented for him to say that. Yes, but I would submit to the court . . . And one last thing I would, yes. Keeling, I felt like there was some evidence that he worked out . . . His defense was a scienter one. I thought they were all in. I thought I had a tacit consent. But they all got on the stand and they told Judge Ezra, no, we didn't give him consent to say we would be his dog instructors. Correct. Okay. So how is that . . . That's pretty different than Dubin, right? Dubin, the patient, he consented to exactly what he got. He got treatment they overbilled for. Here the victims, and at sentencing the district court did find that these instructors were victims. It's hard for me to wrap my head around how it couldn't be central when they end up the victims of the fraud. To the extent we're going to talk about victims. They weren't. Well, that was the finding. Their names were never used. They never lost a dime. Well, it's a sentencing finding. I don't know if you attacked that on direct . . . Yeah. No, and all I'm saying though, Judge, is that's something that additionally goes to the weight as we start to look at the crux. And once again . . . Your point is the four instructors that were put forth, none of them were harmed in any way? One of them had already, as I say, when the filing went through the fourth time, he was deceased. No. None of them. They all testified. Went on with life. There was no financial harm to them. In fact, one of them went on to open a . . . it may have been part of the I don't know what happened. That would be outside the record, Your Honor, the part about what he tried to do. But he did open a dog training school in Dallas, near Dallas, in a small town, Midlothian. Of course, Will, I'll let that . . . If you have any questions for me, I'll be back. Thank you, Your Honor.           Mr. Durbin. Mr. Durbin. Mr. Durbin. Mr. Durbin. Mr. Durbin. Mr. Durbin. Mr. Durbin. It's good to see you. Good afternoon. May it please the Court. Mr. Durbin. Yes, Sir. You've been around long enough that you were here when McNally came down. Yes. So we had a lot of cases under rect appeal charged the mail fraud was charged under an overbroad theory. Yes. Those cases, if I remember, what do you remember? Am I right that then they get remanded as we are here today, and what's the question we're answering? Is it a legal error subject to plain error review? I think the way I've looked at it is it's a sufficiency of evidence question. Was there sufficient evidence to support the District Court's finding of guilt as the Supreme Court has construed the statute in Durbin? Do you see my confusion? I do. I do. Well, the parties both say determine guilt based on the pattern 1028, which had the in relation to language. The Supreme Court's now said it's tighter than that, 3100. It's more than that. That's correct. Yeah. That sounds to me like a legal error, but if the government's not pressing plain error, you're saying this is a preserved sufficiency argument, and then you couldn't retry him. Isn't that right? That has been what my assumption has been. Now, you raise a really good question, and I don't know the answer to that, but my sense . . . because I took a look at the standard of review last week, and I thought, oh, I need to write a letter because we didn't address the standard of review because the panel that considered it applied the substantial evidence standard in determining whether or not there was sufficient evidence, and then it followed the en banc decision in Durbin to dispose of the claim that was specifically raised on appeal, but I don't think was specifically raised in the district court, that is, the theory under Durbin that this was not an unlawful use under the aggravated identity theft statute. So I wish I could . . . I would have thought it was like McNally, they've tightened up the legal standard, therefore, we're back down, and there are three options. We can affirm because the verdict necessarily included the facts . . . I think so. . . . or vacate, remand, government can retry on the proper legal theory. I think so. But here's the third twist just in case you've seen it in all your years. Since this was a bench trial, we're in a slightly unique position. There's no unanimity problem, but we could do what some circuits did, which was vacate and ask the district court to give us the findings that the district court made to accompany the verdict, and I'll make that into a question. That would make . . . Pre-trial, the defendant here did say under Rule 23, I want factual findings. That would be mandatory, but then we get to the end, and I don't see Judge Ezra entering that. No, it's a general verdict that he entered. That's correct. Do you know whether in this record the defendant said somewhere during the trial, actually, I don't need factual findings? I don't. Okay. I can't represent . . . All right. Go ahead. Go on with your argument. I think you could do, frankly, all three of those. I don't know that we would retry it. I'm going to guess you're going to say here, though, the record and the charge, everything is consistent with it being central and crux, and therefore, none of those options need to be . . . I believe so, and as you pointed out in our brief, considered by the panel, we basically made an argument that the evidence supported the theories under the en banc dissent, which, as I read it, it's not identical to, but it's very similar to. I mean, it's the same sort of themes that are running through that, as well as all of those cases, Miller, Medlock, and so forth, that come up with a different result. If you had to rewrite the pattern, what would you say is the proper instruction now? If I had to, I'm sorry? If you had to rewrite the pattern instruction for 1028, aggravated . . . you are an aggravated identity thief if the government shows beyond reasonable doubt what? I think they would have to say you must find that the defendant misappropriated identification information of a person, and that he used that in relation to the underlying fraud, and that in determining whether or not that use in relation to meets the requirements, you must determine whether or not the misrepresentation or the use went to the crux of that offense, which is the fraud. Let's talk about the facts of this case. Yes, sir. Do I understand correctly that the theory is that Mr. Croft used these four names to defraud the federal government into thinking that these were qualified instructors, when in fact there were unqualified instructors being used? That's correct. The immediate object of his fraud was to get certification from the Texas Veterans Commission as a non-credit or a non-degree institutional program, so that . . . But the issue is not so much who they are. It's just whoever we're naming, trust me, these are four qualified, certified instructors, when in fact they turned out that the service was done by unqualified. Well, I don't know if I agree with that characterization, because I think it was very important who they were, because he had listed himself and some other instructors in the earlier applications that TVC did not accept. Right. And I take it that's because Croft himself is, for whatever reason, not considered qualified. I'm sorry? I take it that's because, for whatever reason, Croft himself was not considered qualified. He was not. No, I don't believe he was. The key thing is, it sounds to me what you're saying is the four instructors that were represented at the federal government, they were represented as being qualified, when in fact there were unqualified people who actually gave the service. The original ones, but the four that we're talking about, Stanley, Keeling, Bragg, and Underwood, they were also attached to that their certifications, their qualifications. Right. So, in other words, I'm just trying to key in, the falsity was I have qualified people teaching, when in fact he did not have qualified people teaching. Is that correct? Well, that's correct. And it was also— So, here's why I'm asking— These are the— Here's why I'm asking—go ahead. I'm just—these are the qualified people. Right. So, the reason I'm asking is the penultimate paragraph of Dubin says, here, petitioner's use of the patient's name was not at the crux of what made the underlying overbilling fraudulent. The crux of the healthcare fraud was a misrepresentation about the qualifications of petitioner's employee. Why does that language not apply here? These weren't employees, because in this— That's the difference? In this particular case, the who was the same as how he committed the fraud. It went directly to it. That was the specific information that TBC was looking for is who are they and what are they— You're saying this language is distinguishable because here, we don't have employees. We have independent contractors or something? I don't think they were independent contractors. He was saying these are my qualified instructors. It was these specific people who were qualified, so that it was essential to use those people— So, that if they were on the payroll, if they were employees, you would concede Dubin applies, but because they're not employees, you think Dubin doesn't apply. If they were on the payroll, it wouldn't have been a fraud, I don't think. If they were on his payroll, they would have been the—I'm assuming they would have been the instructors. I mean, the fraud was—I'm misunderstanding you. I thought the fraud was I have qualified instructors, and in fact, I'm using unqualified instructors. But he had to list them. It wasn't enough to say, I have qualified instructors. He had to list them on the form, so the form itself called for specific information about identities and qualifications, so that's different from Dubin, because in this particular instance, to perpetrate the fraud, he had to give names, and he gave these particular names without the authorization. He had misappropriated them. You're saying he wouldn't get the GI funds without coming up with somebody's name. I think that's right. That's the way I understand the evidence. That's what I understand the attachments J and K were about, because he went back and forth, and there's notations. We refer to it in the original brief that B.B. Glasgow was saying, he hasn't done K, and K is the one that lists the names and qualifications. I agree. I mean, Dubin, we're still going to find out what the line is. The Eleventh Circuit is the only other circuit I know that's done this. They've parsed through the people whose identities were thought, and one could contrast Underwood, the dead guy, with Needling, is that his name? Needling? Keeling? Keeling. That might be possible, because clearly Underwood gave no services. There's no issue of how with him. No. It was just the who. It was just the who. But according to Croft, as you heard him just stand up here, Keeling was actually there, and he was doing things. There was an appropriation of his identity to get the GI funds. That's true, arguably central to the fraud, but a closer call, because these dogs apparently were trained in the end. Perhaps, but that was a question for the fact finder, and the fact finder apparently found against that, because the judge, Judge Ezra, found that there was fraud. That's what Judge Ezra concluded, and so, yeah, there was evidence from which Croft can argue, but you're not sitting as the fact finders for that. The question for you is, was this misrepresentation of identities and identity information at the crux of the fraud that he perpetrated, and the lying about who the instructors were, which was a critical part of certification so that he could end up in the eligibility for . . . Is it relevant that the district judge, when at sentencing, found that the instructors themselves were the victims of the fraud? Is that relevant to the Dubin inquiry or not? I don't read Dubin to specifically answer that question. I don't . . . Dubin himself clearly . . . I mean, the patient in Dubin in no way was victimized. Well, we see that a little bit differently, because that patient actually had a limited amount of benefits under the Medicaid program, so anything that was falsely billed, it works against him in the Medicaid program. Now, the veterans here stand in that same type of position, because they lost their certification because of this fraud as soon as the school was decertified. They lost their certifications, so all of that was wasted time, and they had to do it over again somewhere, and they were out veterans' benefit. The Veterans Administration would not give them credit for the payments out of their accounts to the school. I'm sorry. You're saying . . . you're not talking about the instructors who were hurt. No, I'm talking . . . You're talking about the veterans. I'm talking about the veterans. So there were . . . Thought they were getting good training, and it turns out it was . . . Exactly right. As far as the instructors are concerned, it seems to me that if I make misrepresentations in my business about your affiliation with me, for example, you leave the bench and you come to work for my law firm, or I say you've come to my law firm, but you haven't. I've taken your identity. I'm advertising that I'm using . . . that you're now a counsel or whatever it is to my law firm. That affects, I think, your reputation. There is a risk that ends up on your reputation because of my misrepresentations about your affiliation. I think those instructors . . . No, I think that's a fair point, but I think you've already conceded you had a similar harm and need a greater harm in Dubin, and that did not matter to the Supreme Court. I'm sorry. We had a greater . . . You had a harm in Dubin, too, to the individuals whose identities were taken, and obviously the Supreme Court didn't care about that. They didn't care. I mean, they didn't include those, but that was . . . but this Court did consider that. The dissents did consider that. That was . . . All right. But we're not bound by the dissent. We're bound by the Supreme Court. I mean, we can argue about what the facts were, but I mean, Dubin is what it is, and what it says is that it goes to the who involved in the offense and not the how. I would say in this case, the who and the how are basically the same. The way he perpetrated the fraud was in the who that he represented because that was the determining factor. This is the problem I have with your case at the end of the day. You know where I voted in Dubin, so I agree with you, but I'm no longer bound by that. Yes. What I have is the Supreme Court's case. The Supreme Court seems to be setting up a dichotomy. There are cases where the crux is about the name, and there are cases where the crux is not the name, it's the qualifications. Why isn't this a qualifications case just as much as Dubin is? Well . . . You can't get money from the federal government if you don't have a patient name as well as the service, but the Supreme Court says, yeah, there's a name in there, but that's not what's important. What's important is the qualifications being misrepresented. It seems to me Croft is the exact same case. Well, I don't know if it is the exact same case because we have evidence in Croft of other names that were submitted that were not accepted, and they were submitted as qualified instructors. They didn't accept . . . You're referring to Croft and Croft himself. I'm referring to Croft and those others so that the names really were accrued. Why does that change the equation? Why does that change the equation? Because under the circumstances of this case to perpetrate the fraud, Croft had to name who the qualified instructors were, otherwise he wasn't going to get away with it. But again, like in Dubin, you have to submit the name of the patient. The names are unquestionably part of the case. That's why textually 1028A theoretically applies. Dubin just adds, the Supreme Court has added an additional test. Right. It may not satisfy. But the court said that you look at the crux of the underlying crime, which is the fraud. Well, the crux of this was the false names. That's how he perpetrated the fraud. I guess what I'm looking for is the principled line that tells me the name wasn't the crux in Dubin, but it is the crux here. How do you draw that line between Dubin and Croft? Well, the difficulty is, I think, is Dubin is a billing fraud case. This is not. This is not billing fraud. This is a different type of fraud that's going on. And I think what the court was looking at . . . What would you call this kind of fraud if not billing? It's a misrepresentation of qualification? Misrepresentation to get certification, yes. It's a . . . Doesn't that cut against you? I think that sounds like it's even more of a qualifications case than a name case. Well, I suppose that's part of it, but to establish the . . . He didn't just lie and say, I have qualified instructors, which was the significant one. He had to provide the information so that the Texas Veterans Commission could assess whether or not they had qualified instructors. He couldn't just say, well, we've got qualified instructors. That's not what that was. He actually gave the names and the qualifying documents that established that they were qualified so that the TVC could make the determination, yes, you satisfy the requirements for certification. So I think that the actual use of names in this circumstances was essential to it, was the crux of the fraud. And I think the evidence showed that because when he didn't have it, the certification didn't go through. And that's how this is different from Dubin. It didn't have to be an actual patient in Dubin for that billing. Besides, I'm not . . . I mean, like I say . . . What do you mean by that it didn't have to be a patient? Well, it didn't . . . I suppose they could have put any patient's name. They could put any name they wanted to on there. It just had to submit it through. In Dubin? In Dubin. You know the case pretty well. I don't. I won't.  I know some of it, but I'm not going to represent the court. Did they put the patient on the stand, and he said, I never consented to anything? I don't know the answer. But here, the people whose identities were stolen took the stand. Three of them did. And . . . Yeah, the fourth one is dead. And so three of them did, and they said they didn't. And two of them, I think, was fairly clear. In fact, one of them, Croft, didn't even want, was what the testimony was, bragged he didn't even want him teaching for him, but he put him down as a qualified instructor. And Keeling, or Stanley, there was, as you have already pointed out, there was some confusion about exactly whether he had done some work in the past and what the nature of the work was. He was pretty clear that he was not on board. And we draw, I mean, of course, Gorsuch says it's now a squint test. Did the 11th Circuit clear it off at all in Gladden? Do you recommend that we look to Gladden? Is there any clarity now? Well, I cited it in the brief. What Gladden does, basically, is say, in the circumstance where they actually took names of real patients and submitted fraudulent prescriptions for reimbursement, that satisfied Dubin. But where the defendant, Gladden, was involved in getting employees to submit their own falsified prescriptions, not in the name of anybody else, but in the name of themselves, that was not a use under Dubin. So I mean, that's the example that we have, but again, what we're doing is trying to translate what was clearly a line of cases involving billing fraud and overbilling and that sort of thing. This doesn't quite fit in that. This isn't the overbilling circumstance. This is, I would submit, the fraud was the essence of what the certification was, and that's what the misuse of the names was. It's sort of the idea you're going for, is in billing cases, you're going to have a lot of non-Crux cases. It could be. Yes. Right? Okay. Yes. Whereas this type, which is more like, which is obviously Dubin, you're saying this type of fraud is going to be more likely to fall within the, even under the Supreme Court's take. I think that's right. And as I read Justice Gorsuch's opinion, and that came out after, there's a reference in footnote 20 of our brief as well, is it's a little bit confusing. So if you overbill, or if you cheat on the restaurant tab while the customer is there, well, that doesn't satisfy Dubin, but if they run the card separately the next day for charges that never existed, well, that might satisfy Dubin. I'm not sure how clear that is, but I think the facts of this case are much more clear because of the nature of the fraud, what the purpose of it was, and because the misrepresentation went specifically to that fraud to mislead. Did you all want to talk about the bail? Oh. You have 34 seconds left. I'm at your . . . I'm not going to decide what I was going to talk about. I'm at your disposal, but I think the information we provided in the letter . . . Yeah. All right. You gave us the prison time. That was very helpful.   I'll give you the rest of my time back. Thank you, counsel. Thank you. Thank you. Thank you. Thank you. Thank you. Roberto. Very shortly, Your Honor. My understanding was the court did want us to briefly, if asked I guess, to mention the issue of a bond. Obviously, the issue of a bond pending appeal, of release pending appeal. I understand that's one of the things, and the government provided that if indeed these counts were set aside, he would be ready for release, and therefore, if there is a substantial question that could lead to . . . I'm sorry. Their letter said he wouldn't be until next August. I thought it said August of this year. I apologize. This next August. No, if . . . Twenty-three. . That's why she's yelling for August 31st. Right. Already passed. August 31, 2023 is your letter. I get excited when I get anything right, your Honor. Yes, but that's your argument. That if he's substantially likely to prevail, he's already served his time. He should get a bond. Not a bond, I'm sorry. Lease pending appeal. And I did want to, one of the things that, and as I hear facts, sometimes I don't hear clearly, if I heard some comment on the fact that what became, what happened to the veterans who took this course that the government hardly introduced barely any evidence about the veterans because they couldn't find a lot of them, to find out what kind of training they got, what were they doing, I don't think that's part of the case yet. And I would issue that to the court. I don't think anything really happened. That's part of our statement is that beyond these four instructors, I wanted to make sure I understood something with Judge Howell. Your Honor, as I heard you say, I thought you said, and if I'm wrong, I'm wrong, that these four instructors, my understanding of the case is that they all testified, he didn't have enough permission and we didn't do the work. I heard you perhaps mention that those four weren't qualified. And I believe that's really, it's kind of not an issue because they didn't even do the work is what they testified to. I just wanted to clarify that and if I'm . . . once again, the record will bear it out. I just wanted to make sure that was understood. Maybe I didn't hear that right, Your Honor. I just wanted to be careful about the facts because in their testimony, I will say this was clearly that they never gave him permission and they never went out and did the work, with the exception of one, he did some work. Unless the court has any questions, may I be excused? Thank you, Counsel. Thank you, Your Honor. The court will take this matter under advisement. We're going to call the next case, which is cause number 22-206.